UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DARRELL RICE, )<br>)<br>Defendant ) | No. 07 Cr. 833 (JSR) |

**DEFENDANT DARRELL RICE'S SENTENCING MEMORANDUM**

**THACHER PROFFITT & WOOD LLP**
Patrick J. Smith
**Two World Financial Center**
**New York, NY 10281**
**(212) 912-7400**

*Attorneys for Defendant Darrell Rice*

## <u>Table of Contents</u>

<u>Page(s)</u>

Preliminary Statement ........................................................................................................... 1

Procedural Background .......................................................................................................... 1

Discussion ............................................................................................................................... 2

A.     Applicable Legal Standard .......................................................................................... 2

B.     After Weighing the Relevant Section 3553(a) factors, the Court Should Find that a Lesser Sentence Reflects the Seriousness of the Offense, Adequately Affords Deterrence to Criminal Conduct and Protects the Public from Further Crimes by Mr. Rice ...........................................................................................................................4

          1.     The History and Characteristics of the Defendant ................................................. 4

          2.     The Impact of the Sentencing Decision on Mr. Rice's Young Son ........................ 8

          3.     The Nature and Conduct of the Offense ............................................................... 10

          4.     The Disparity between Cocaine Base and Cocaine Powder Sentences ................ 11

Conclusion ............................................................................................................................. 12

## Preliminary Statement

The Probation Department has prepared a Presentence Investigation Report ("PSR") in this case which recommends a term of imprisonment of 70 months. This recommendation is at the lowest end of the Guidelines range that was stipulated in the plea agreement -- 70 to 87 months -- as calculated under the advisory Sentencing Guidelines. However, a sentence at the statutory minimum of five years would be sufficient, but not greater than necessary, and will adequately promote the sentencing objectives of punishment, deterrence and respect for law, while protecting the public from further crimes of Mr. Rice. At the same time, a sentence of five years would be just and fair given the hardships Mr. Rice has endured living a life of poverty and despair; the need for Mr. Rice to be present in his young son's life to prevent him from becoming ensnared in the cycle of drugs, violence and poverty that exists in the community in which he is being raised; Mr. Rice's role as a low-level drug dealer and the unjust disparity in sentences resulting from the crack/cocaine ratio.

For the reasons set forth below, a sentence at the statutory minimum of five years is the appropriate sentence in light of all relevant factors in this case.

## Procedural Background

Mr. Rice was arrested on August 7, 2007 and has remained in custody since the date of his arrest. (PSR ¶ 7). On October 26, 2007, pursuant to a written plea agreement, Mr. Rice pleaded guilty to a one-count superseding Information charging him with conspiring to distribute more than 5 grams of crack in violation of Title 21, United States Code, Sections 812, 841(a)(1) and 841(b)(1)(B). In the plea agreement, Mr. Rice stipulated to selling at least 20 grams but less than 35 grams of cocaine base. The offense conduct described in the PSR references an incident

on October 1, 2004 where Mr. Rice sold 25 vials of cocaine base for $100 to a confidential informant working with the FBI. (PSR ¶ 5).

The PSR agreed with the Guidelines stipulations set forth in the plea agreement between the parties, which provides for an adjusted offense level of 23. (PSR ¶ 18). Mr. Rice received a three-level-adjustment for acceptance of responsibility pursuant to U.S.S.G §3E1.1(a) and (b). Mr. Rice's criminal history score computed to a total of 9 points, resulting in a criminal history category of IV. (PSR ¶ 35). Thus, the applicable Guidelines range found in the PSR is 70-87 months imprisonment. (PSR ¶ 64).

## Discussion

### A.    Applicable Legal Standard

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245 (2005) rendered the Sentencing Guidelines advisory after holding that the fact-finding process in the Guidelines procedures was a violation of the Sixth Amendment. Recently, the Supreme Court decided two landmark decisions, *Kimbrough v. United States*, 552 U.S.___, 128 S.Ct. 558 (2007) and *Gall v. United States*, 552 U.S. ___ , 128 S.Ct. 586 (2007), in which it further clarified the mechanics of federal sentencing in today's post-*Booker* landscape by reaffirming loud and clear that the United States Sentencing Guidelines are purely advisory and only "serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough*, 128 S.Ct. at 564.

In *Gall*, the Supreme Court crystallized the procedure for fashioning an appropriate sentence by requiring the sentencing court to first calculate the applicable Guidelines range, and then allow the defendant and the government the "opportunity to argue whatever sentence they

deem appropriate." 128 S.Ct. at 596. The sentencing court must then consider all of the factors

identified in Title 18, United States Code, Section 3553(a), including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for-
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;
>
> (5) any pertinent policy statement ... [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C § 3553(a); *see also Kimbrough*, 128 S.Ct. at 561 (stating that *Booker* permits the court

to tailor the sentence in light of the other statutory concerns as well). After full consideration of

all relevant factors, the sentencing judge is then permitted to fashion an appropriate sentence,

regardless of whether that sentence is a Guidelines sentence or not. *See United States v. Crosby*,

397 F.3d 103, 113 (2d Cir. 2005).

In making a final sentencing determination, *Kimbrough* clearly held that although district

court judges "must include the Guidelines range in the array of factors warranting

consideration," the judge "may determine . . . that, in the particular case, a within Guidelines

sentence is 'greater than necessary' to serve the objectives at sentencing." *Kimbrough*, 128 S.Ct. at 564. In Mr. Rice's case, after weighing the most relevant Section 3553(a) factors against the objectives of sentencing, it is clear that a sentence within the Guidelines range is greater than necessary to serve the objectives at sentencing. Accordingly, we respectfully request that the Court exercise its discretion to impose a non-Guidelines sentence at the statutory minimum of five years.

**B.      After Weighing the Relevant Section 3553(a) factors, the Court Should Find that a Lesser Sentence Reflects the Seriousness of the Offense, Adequately Affords Deterrence to Criminal Conduct and Protects the Public from Further Crimes by Mr. Rice**

In fashioning a sentence that is not greater than necessary to serve the sentencing objectives, the Court is required to consider the following Section 3553(a) factors as applied to Mr. Rice: (1) Mr. Rice's "history and characteristics," which include his difficult upbringing in the projects and the devastating impact his imprisonment has on his young son; (2) the "nature and characteristics of the offense," namely Mr. Rice's role as a low-level drug dealer and (3) "the sentencing range established" by the Guidelines and "any pertinent policy statement," specifically, the disproportionate effect the crack/cocaine ratio has on Mr. Rice's Guidelines range. *Kimbrough*, 128 S.Ct. at 570 (stating the Section 3553(a) factors that sentencing courts must consider). We respectfully submit that the balance of these factors counsels the Court to sentence Mr. Rice to the statutory minimum of five years -- a sentence that sufficiently serves the goals of sentencing, but is not greater than necessary.

**1.      The History and Characteristics of the Defendant**

Mr. Rice was born in the Bronx, New York on October 10, 1980. Raised in housing projects in the Bronx, Mr. Rice has endured a difficult life dominated by poverty, drugs and violence. The environment in which Mr. Rice was raised has directly and significantly

contributed to where he has ended up today -- before this Court facing another lengthy prison sentence. Although his parents were married, his mother, Debra Rice, essentially raised her sons alone because their father was in and out of jail throughout their lives. Even when Mr. Rice's father was not in jail, he did not have the support of both of his parents as they both used crack during his childhood. (PSR ¶ 45).

Mr. Rice's youth in the projects was plagued by constant struggle. During his early years, Debra Rice struggled as a single mother on a social worker's salary to feed, clothe, protect and provide shelter for her children. Debra Rice also struggled with her ailing physical state resulting from severe diabetes and high blood pressure. As Mr. Rice entered his teenage years, his mother's battle with her health grew increasingly worse rendering her disabled and unable to work. (PSR ¶¶ 45, 46). Debra Rice was forced into retirement at an early age, making an already ominous financial situation even more desperate, leaving the family to struggle to survive on welfare payments.

As his mother's declining health and the dire financial situation took its toll on Mr. Rice, tragedy struck in 1993 when his older brother, Daniel Rice, was shot and critically wounded. (PSR ¶ 47). This was a harsh turning point in Mr. Rice's life. Daniel was Mr. Rice's only sibling -- he was his role model and sole protector growing up in the projects. Despite an otherwise difficult upbringing, Mr. Rice described life in the Bronx as "alright" before Daniel was shot. (PSR ¶ 47). The shooting left Daniel paralyzed, confined to a wheel chair and unable to offer the protection and guidance Mr. Rice had grown to rely upon. At thirteen years old, Mr. Rice was left unprotected and vulnerable as he faced the burden of not only protecting himself, but of being prematurely thrust into the role of sole provider for his ailing mother and disabled brother. Adding to the insurmountable challenges Mr. Rice faced after such a devastating year,

the absence of Daniel's protection was soon realized as merely one year after Daniel's shooting, Mr. Rice was robbed and shot in the leg in at the age of fourteen. (PSR ¶ 47).

The harsh realities of life in the projects weakened Mr. Rice's resolve to a point where he was no longer able to abstain from the violence and crime that permeated his environment. Despite his best efforts to resist the criminal world around him, Mr. Rice was arrested and incarcerated for his first offense at the age of fifteen. Since then, Mr. Rice has tried to avoid criminal activity and support himself and his family through lawful means, and at times he has succeeded, but unable to find ample employment, Mr. Rice has at times reverted back to criminal activity. As a result, Mr. Rice has a lengthy criminal history.

Mr. Rice's criminal history, however, does not accurately portray his true persona. Behind the crimes he has committed is a good young man who genuinely wants to break the cycle of criminal activity so he can raise and support his children in a lawful and respectable manner. Mr. Rice has strong family values and has been a loyal caregiver to both of his grandmothers and his own mother. (PSR ¶¶ 46, 48). Mr. Rice is also a loving father. Mr. Rice has a five-year-old son with his long-time girlfriend, Unique Williams, with whom he also raises a second child-- Unique's daughter, Jania Williams. (PSR ¶ 50). Despite the fact that Jania is not Mr. Rice's biological daughter, he has whole-heartedly taken responsibility for her upbringing as if she were his very own. (PSR ¶ 50). Mr. Rice's children mean the world to him and he wants very much to be the father to them that his own father was not.

In support of his goal to protect and provide for his family, Mr. Rice has also tried educate himself and find stable, lawful paying jobs. After obtaining his GED while incarcerated at Rikers Island, Mr. Rice held jobs as a messenger for six months in 2000 and as a security guard for over a year from 2001 through 2002. (PSR ¶¶ 56, 59, 60). Seeking to further his

opportunities, Mr. Rice incurred student loan debt to enroll himself at Borough of Manhattan Community College, where he attended classes for a semester while working as a security guard. (PSR ¶ 56). Notably, Mr. Rice was not arrested for any criminal offenses while working as a security guard and attending school. Unfortunately, when Mr. Rice's position as a security guard ended due to the expiration of the company's security contract, he found it impossible to obtain another lawfully paying full-time job as no one wanted to hire him in light of his record. Mr. Rice soon resorted to dealing drugs and was subsequently arrested for possession of marijuana the following year. (PSR ¶ 27).

Prior to Mr. Rice's arrest for the offense for which he is now being sentenced, Mr. Rice had been working as a clean-up worker at a construction site for two years. (PSR ¶ 58). Mr. Rice was able to find this work as a result of having learned carpentry skills while incarcerated at the Green Corrections Center. (PSR ¶ 57). Mr. Rice was eager to further develop his carpentry skills, but his time on the construction site was cut short when he was arrested and incarcerated in August 2007. Mr. Rice does not desire a life of criminal activity, but it has unfortunately been one of the only accessible means for him to support his family. Mr. Rice accepts that he will be sentenced for a minimum of five years, but sincerely hopes to be sentenced to a facility where he can learn vocational skills that will make him employable when he re-enters society so he can set a positive example for his children as a contributing member of society. It is abundantly clear that Mr. Rice is a good father and a good person who has tried to resist the unfortunate circumstances into which he was born, but like so many who have been victims of the same cycle, he has not been strong enough to always resist the unfortunate criminal means to support his family.

### 2.    The Impact of the Sentencing Decision on Mr. Rice's Young Son

In weighing the costs and benefits of alternative sanctions, the Court "ought to consider and weigh known harms to the family resulting from imprisonment against unknown or unclear social benefits before determining what sentence to impose."  Eleanor Bush, *Considering the Defendant's Children at Sentencing,* 2 FED. SENT'G REP. 194 (1989).  The interest of Mr. Rice's son, Darrell Rice, Jr., is a significant factor this Court can and should take into account when fashioning an appropriate sentence in this case.  *See U.S. v. Kon*, No. 04 CR 271-03, 2006 WL 3208555, *5 (S.D.N.Y. Nov. 2, 2006) (considering the impact on the defendant's daughter to be extraordinary family circumstances sufficient to support either a downward departure pursuant to U.S.S.G. §§ 5H1.6 and 5K2.0(a)(4) or, alternatively, a non-Guidelines sentence in consideration of 18 U.S.C. § 3553(a)(1)).

Children whose parents have been arrested and incarcerated face unique difficulties.  Studies have shown that "[f]or children who become father-absent prior to the age of five, the overall effects of paternal loss seem to be profound and long-term.  This is especially true for male children." Lee A. Beaty, *Effects of Paternal Absence on Male Adolescents' Peer Relations and Self Image,* Adolescence: Journal of Psychopathology and Social Sciences (1995), *available at* http://www.encyclopedia.com/doc/1G1-17856540.html.    (Ex. A).    The behavioral consequences can be severe, including "emotional withdrawal, failure in school, delinquency and risk of intergenerational incarceration."  Charlene W. Simmons, *Children of Incarcerated Parents*, 7 CAL. RES. BUREAU No. 2 at 1 (2000) (Ex. B).

Mr. Rice's imprisonment has already affected Darrell Jr. significantly.  Throughout Darrell Jr.'s entire life, Mr. Rice has played an enormously large role and shared a very close relationship with his son.  As Darrell Jr.'s mother worked long hours during the week, Mr. Rice assumed the role of primary care taker for Darrel Jr.  Mr. Rice woke and fed Darrel Jr. each

morning, dressed him for school, took him to and from school each day, and took him to all of his doctor's appointments. In the evenings, Mr. Rice prepared dinner for Darrell Jr., helped him with any homework assignments and played with him until it was time for bed. Mr. Rice was a very big influence in his son's life and his absence is devastating. Darrell Jr. was present when the Marshals arrested Mr. Rice and is haunted by the images of the Marshals forcibly taking his father from their home. Witnessing his father's forcible arrest has severely disturbed Darrell Jr. as he talks about the incident daily and at times breaks down in tears for no apparent reason -- something he never did before his father was arrested. Darrell Jr. asks for Mr. Rice every day and is reaching the point where he is unable to visit Mr. Rice in prison because the separation is too traumatic and he becomes inconsolable when forced to leave his father at the end of each visit.

The negative effects on Darrell Jr. are not only witnessed by his family, but his teachers at school have also noticed a marked decline in his emotional state. Prior to Mr. Rice's arrest, Darrell Jr. was a very active and happy child. His teachers and daycare providers have since noticed Darrell Jr. retreat to a depressed state. One of Darrell Jr.'s teachers found his behavioral changes so significant that she telephoned Darrell Jr.'s mother to inquire the reasons for the change. After discussing Mr. Rice's arrest with the teacher, they enrolled Darrell Jr. in a program to receive weekly counseling sessions at school to help him cope with his father's absence.

A lower sentence can have an impact on the likelihood that Mr. Rice's five-year-old son will become a part of the generational cycle of incarceration and father-absence. Mr. Rice does not want to be deprived of the opportunity to impact his son positively by being an absent parent like his own father. Until Mr. Rice's arrest, he maintained a very active role in raising his son,

and although Mr. Rice recognizes his shortcomings and the negative affect his own actions will have on his son, he desperately wants a second shot. In his own words, Mr. Rice pleas for the Court's "leniency" stating, "I don't want my kids to follow my footsteps. I want to guide my kids the right way, a way my father didn't guide me to." (Ex. C.). Sentencing Mr. Rice at the five year mandatory minimum, as opposed to the seventy months recommended by the PSR, would allow him to return home to his son before he reaches the age of ten -- a critical point where Darrell Jr. is most vulnerable to criminal activity. Mr. Rice could then offer him the protection and guidance he was not afforded in his own youth, to help his son break the cycle into which he was born.

Mr. Rice suffers daily the pain of separation from his son. This more than anything else has already punished him sufficiently to deter any future criminal conduct. The devastating effects of Mr. Rice's imprisonment are already manifesting themselves in a negative way for Darrell Jr. The longer Mr. Rice is incarcerated, the more likely it is that his son will continue to suffer and perhaps follow in the footsteps of his own father and turn to criminal activity when he reaches adolescence. Accordingly, from the perspective of five-year-old Darrell Jr., his mother and ailing grandmother, who will be responsible for raising him until his father is released from prison, and the community into which he will grow up, the sooner Mr. Rice can be returned to and re-integrated in society as a working man and responsible father, the better.

### 3.    The Nature and Conduct of the Offense

Mr. Rice accepts full responsibility for his unlawful actions and by no means seeks to diminish the seriousness of the crime he committed. Nonetheless, it is fair to point out that on the relative ladder of drug dealers, Mr. Rice was a low-level dealer selling small quantities of drugs when he needed the extra money to support his family. He was not a ring-leader in the

charged drug conspiracy, nor were his motivations for dealing drugs typical of most drug dealers -- greed or a desire to become rich. Rather, Mr. Rice dealt drugs because it was one of the few means available to him to help support his family. This is certainly no excuse for his criminal activity but does explain how Mr. Rice ended up where he is today.

Indeed, the government recognized Mr. Rice's relatively minor role, as they did not seek to prosecute him for this offense until three years after the date of the offense, when he was arrested for another non-drug offense. Imprisoning Mr. Rice for a period longer than five years will not further the government's goal of eliminating the major drug operations in this City. In reality, longer sentences for low-level street dealers do not reduce crime or protect the public because there are always other street dealers who are quickly able to replace those who have been arrested. Because enhanced sentences do not protect the pubic or decrease the recidivism rate for street-level dealers, Mr. Rice should be sentenced outside the Guidelines range to the mandatory minimum of five years.

### 4.    The Disparity between Cocaine Base and Cocaine Powder Sentences

"[I]n sentencing under the now-advisory Guidelines, a sentencing court may take into account its view that the penalties for distributing crack are excessive in relation to those for other similar drugs." *United States v. Polanco*, No. 02 Cr. 442-02, 2008 WL 144825, *2 (S.D.N.Y. Jan. 15, 2008) (citing *Kimbrough*, 128 S.Ct. at 564). In *Kimbrough*, the Supreme Court held that a district court is free to disagree with the Guidelines' 100/1 crack-to-powder ratio and impose a below-Guidelines sentence on that basis. *Kimbrough*, 128 S.Ct. at 578.

Even in light of the November 2007 Guidelines amendments, which reduced crack sentences by two offense levels, the Supreme Court noted that this "modest amendment" still "yields sentences for crack offenses between two and five times longer than sentences for equal amounts of powder." *Id.* at 569. The amendment serves only as a "a partial remedy for the

problems generated by the crack/powder disparity." *Id.* Indeed the Supreme Court noted that the Commission's own reports, "based on additional research and experience with the 100/1 ratio," conclude that the 100/1 disparity between crack cocaine and powder cocaine sentences is unwarranted and "fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the [Anti-Drug Abuse Act of] 1986." *Kimbrough*, 128 S.Ct. at 568.

The Guidelines amendment clearly has not cured the unfair sentences created by the disproportionate crack/cocaine ratio. Indeed, had Mr. Rice been convicted of possessing an equal amount of cocaine powder, his base offense level would have been 14 as opposed to 26, and after the 2 point reduction for acceptance of responsibility, Mr. Rice's sentencing range would have been between 21 to 27 months as opposed to 70 to 87 months. Thus, Mr. Rice respectfully urges the Court to consider that the crack/cocaine disparity yields a sentence greater than necessary to achieve the Sentencing Reform Act's purposes, and a sentence at the five year mandatory minimum is more than just in this case.

## Conclusion

For all the foregoing reasons, we respectfully request that the Court impose a non-Guidelines sentence at the statutory minimum of five years.

Dated: New York, New York
       February 6, 2008

                              Respectfully submitted,

                              THACHER PROFFITT & WOOD LLP

                    By:  /s/ Patrick J. Smith
                         Patrick J. Smith
                         Two World Financial Center
                         New York, NY 10281
                         (212) 912-7400

                         Attorneys for Defendant Darrell Rice

# EXHIBIT A

Encyclopedia.com - FREE online Encyclopedias and Dictionaries                    Page 1 of 5



# Effects of paternal absence on male adolescents' peer relations and self-image.

From: Adolescence | Date: 12/22/1995 | Author: Beaty, Lee A.

**adolescence magazine**

This study explores the extent to which adolescent males experience different peer adjustment and masculine self-image as a function of father deprivation. A sample of 40 middle school boys (20 father-present and 20 father-absent) rated each other on peer adjustment and masculine self-image. Results indicate that father-absent boys evidence a poorer sense of masculinity as well as poorer interpersonal relationships than do father-present boys.

INTRODUCTION

Due to the almost overwhelming complexity of modern society and the consequent socio-cultural factors which impact on the structure of the contemporary American family, it is hardly surprising that the variety of alternative family structures has continued to increase during the past generation. One of the most common characteristics of these alternative family structures is paternal absence. Although maternal absence from the family does exist (and can presumably exert a profound influence on children's development), paternal absence is a much more frequent occurrence.

The most frequently mentioned causes of paternal absence are divorce and/or separation, death, and career demands (e.g., military service). Of these, divorce and separation occur most often. Steinberg (1989) noted the differences that paternal absence due to divorce or death can have on a child's emotional development. Hetherington's (1972) research found differential effects of paternal absence due to death and divorce on female adolescents. Probably the least traumatic effects due to paternal deprivation result from prolonged but temporary father absence, since these effects are reversible.

There is also a differential effect of age on the severity of impact of father absence on children versus adolescents. This may well be due to the inferior coping mechanisms of children as compared to those of adolescents, who have achieved increased emotional maturity and have access to supportive social networks in the form of peer groups (Steinberg, 1989). The research literature (e.g., Hetherington, 1966; Biller & Bahm, 1971) strongly suggests that children who become father-absent before the age of five suffer more debilitating intrapsychological and interpersonal difficulties than do children who become father-absent after the age of five. In fact, the potentially debilitating effects of father absence which occur in middle childhood and subsequent to middle childhood seem to become equalized when these children are compared with father-present children.

For children who become father-absent prior to the age of five, the overall effects of paternal loss seem to be profound and long-term. This is especially true for male children. Adelson (1980) reviewed research which clearly showed that father absence can seriously affect the sex role development of boys. Consequently, their adjustment to peer groups can be impaired. While Johnson (1979), who investigated the effects of father absence due to divorce on preadolescent peer relations, found significance between the father-child relationship and social interaction for both boys and girls, Armsden (1986), who investigated attachment to parents and peers in late adolescence, obtained different results. She found that the well-being of males was most highly related to father attachment. In their meta-analysis of paternal absence studies, Stevenson and Black (1988) reported that males who became father-absent prior to preschool showed less preference for stereotypical sex-typed toys than did father-present boys. Thus, the conceptions of societally proscribed masculine and feminine roles may have been affected for these boys.

In a discussion of sex role and socialization, Block (1973) stated that individuals who are high in sex-appropriate behaviors and highly socialized seemed to have derived these traits from family contexts ". . . where both parents were available to the child, both physically and psychologically through adolescence. . . ." (p. 523). If we accept this assertion, then the inverse should be true (i.e., males who are father-deprived should be lower in sex-appropriate behaviors and less well socialized). In other words, their gender role development in general and their peer relationships as well should be affected.

Because of the clear importance of peer relationships in the lives of adolescents, it would seem appropriate to give serious consideration to the impact of father absence on male adolescents. Hughes and Noppe (1991) present a developmentally based hierarchy of peer groups in adolescence. In early adolescence, groups normally consist only of same-sex individuals; in middle adolescence, same-sex groups gradually become heterosexual groups; and in late adolescence, heterosexual groups begin to break down into dyads. This normative developmental sequence can indeed be impinged upon by many variables, including that of father absence.

Lamb (1981) suggested that the masculine role model provided by the peer group can be particularly influential for paternally deprived boys. Such "masculine" attributes as aggressiveness and independence are particularly valued in male unisex peer groups, especially in lower socioeconomic status neighborhoods. In an examination of boys from broken homes, McCord, McCord, and Thurber (1962) found a significant relationship between father-absent boys and female/aggressive behaviors; however, the potential relationship with general delinquency was explained more in terms of the effects of divorce rather than those of father absence.

In their study of Norwegian children, Lynn and Sawrey (1959) postulated that adequate peer adjustment is related to appropriate same-sex identification. Father-absent subjects in their study exhibited poorer peer adjustment, presumably because they were less firmly identified with masculine role models. Hetherington (1966) agreed with this presumption and suggested that early father-absent boys showed greater dependency on peers, showed greater deviation in sex-typed traits, and tended to disfavor activities involving competitive and aggressive play. Biller and Bahm (1971) found that in early father-absent boys, masculinity of self-concept was strengthened when mothers encouraged aggressive behavior. They stated that ". . . ramifications of the quality of the early mother-son relationship (for father-absent boys) may become most apparent during adolescence" (p. 181).

In the present study, the intention was to support the findings of Lynn and Sawrey (1959), Hetherington (1966), and Biller and Bahm (1971) with respect to the effects of father absence on the development of masculine self-concept in male adolescents and the resulting effects on peer relationship adjustment. The hypothesis was that early father-absent boys (those who experience father absence prior to the age of five) evidence dysfunctional effects due to paternal deprivation both in masculinity of their self-concept and in their poor peer adjustment.

METHOD

Subjects

The sample consisted of 40 7th- and 8th-grade (13- and 14-year-old) boys selected from classes in a major Midwestern suburban area middle school. Subjects were selected from a middle school setting because such schools usually have smaller enrollments than do junior high schools, thus providing students with the opportunity for more frequent and indepth peer interactions. From an initial sample of 60 subjects, 40 were randomly selected for the research sample. Half of the subjects (n = 20) were father-present males and the other half (n = 20) were father-absent males who had become father-deprived prior to the age of five years. Father-absent subjects were defined as those who had lived with their mothers or nonpaternal relatives at least two thirds of the time. Mean age for the total sample was 13.4 years; the sample was composed of 59% Caucasian, 30% African-American, and 11% Hispanic subjects. Because the subjects were not of majority age, written parental permission was obtained.

Measures

The primary objective in this attempt to replicate the findings of the studies previously cited was to do so by utilizing a different methodological approach. In this study, sociometric measures were employed to determine the degree of perceived masculinity and the degree of perceived peer group adjustment. Kerr, Nelson, and Lambert (1987) describe two types of sociometric instruments: (a) combination measures, and (b) rating scale measures. With the former,

students are asked to nominate a specific number of classmates according to some interpersonal criteria. With the rating scale procedure, a student is asked to rate each of his/her classmates according to a Likert scale. Thus each individual earns a score which is his/her mean rating from peers.

The sociometric instrument employed in this study was of the rating scale type, consisting of two separate subscales: Part A focused on perceived masculinity, and Part B focused on perceived peer adjustment. Each subscale contained 15 words or phrases which described masculinity and/or peer adjustment. Items descriptive of masculinity included such words as "independent," "aggressive," or "self-confident." Peer adjustment descriptors included such phrases as "Gets along well with others," "Is popular" or "Is one of the gang." Responses were made on a five-point Likert scale which ranged from mostly false to partly false to no opinion to partly true to mostly true. The numeric equivalents for these ratings ranged from 1 (mostly false) to 5 (mostly true).

Procedures

Subjects in the father-present group were given sheets with the names of the father-absent subjects and were asked to rate them; they were told that the scale was attempting to measure masculine self-image and peer adjustment, but were not told that father absence was a criterion. Correspondingly, subjects in the father-absent group were asked to rate father-present subjects and were told the same thing. Data collection schedules were coordinated with division teachers and were completed during a single day. The instrument was given to the students as a group since individual administrations were not time-efficient.

RESULTS

The data were analyzed in a conventional manner. The scoring system for Parts A and B of the sociometric measure was calculated as follows: numeric equivalents to responses ranged from mostly false (equals one) to mostly true (equals five). Each subject in the father-present group rated all 20 subjects in the father-absent group on the 15 criteria for masculine self-image and the 15 criteria for peer adjustment; conversely, the father-absent subjects rated the father-present subjects on the same 30 criteria.

Means of each subscale for both groups were calculated and independent t-tests for self-image and for peer adjustment were computed to determine whether differences in group means reached statistical significance. The mean on masculine self-image for father-absent boys was significantly lower than that for father-present boys ($t = 2.02$ [38], p [less than] .05). Similarly, the mean on peer adjustment for father-absent boys was significantly lower than that for father-present boys ($t = 2.70$[38], p [less than] .01). (See Tables 1 and 2 for these data.) In fact, individual means for most of the self-concept and peer adjustment items were lower for father-absent subjects than for father-present subjects. The exceptions were the following items:

Masculine Self-concept - 5. "domineering," 10. "reckless," and 13. "uncaring"; Peer Adjustment - 3. "is well liked" and 9. "gets along well with both boys and girls."

TABLE 1: t-TEST FOR MASCULINE SELF-IMAGE SCORES

| Group: | Mean: | SD: | t: | Signif: |
|---|---|---|---|---|
| Father-present | 55.1 | 17.4 | – | – |
| Father-absent | 42.3 | 14.8 | – | – |
| Total | 48.7 | 16.1 | 2.44 | 0.05(*) |

* Level of significance for 2-tail test

TABLE 2: t-TEST FOR PEER ADJUSTMENT SCORES

| Group: | Mean: | SD: | t | Signif: |
|---|---|---|---|---|
| Father-present | 57.3 | 19.2 | – | – |
| Father-absent | 41.9 | 11.9 | – | – |
| Total | 49.6 | 15.6 | 2.97 | 0.01(*) |

* Level of significance for 2-tail test

DISCUSSION

A review of the relevant research literature (e.g., Lynn & Sawrey, 1959; McCord, McCord, & Thurber, 1962; Hetherington, 1966; Biller & Bahm, 1971) has revealed some degree of consensus on the negative effects of father absence on the masculine self-concept and peer relationship adjustment of male children and adolescents.

It has been reported that these effects are most traumatic and most long lasting when father deprivation occurs prior to the age of five. In later childhood and subsequently in adolescence, such individuals exhibit tendencies to be more dependent on peers, to be more ambiguous about masculinity, to disfavor competitive games and sports, and to engage in female-aggressive behavior. A commonly cited rationale for the development of such tendencies is the lack of an appropriate male role model during early childhood. It also has been noted that maternal perceptions and behaviors can sometimes have a mediating influence on the severity of these negative effects. However, it has generally been agreed that this mediating effect is less strong when provided by mothers than when provided by fathers.

As Lamb (1981) has suggested, the impact on peer adjustment for paternally deprived boys can hardly be underemphasized since male peers supply a strong role model function for such boys. This function is quite important if we recall that peer groups in adolescence moved through a triarchic developmental sequence from same-sex to heterosexual groups and ultimately to dyads. Thus, the quality of peer interactions for father-absent male adolescents seems to have been affected in some significant way.

In this study, the results support the findings of Hetherington (1966) and Biller and Bahm (1971) with respect to the effects of paternal absence on peer relationship adjustment of adolescent boys. This study departs from earlier methodological approaches by employing a rating scale version of a sociometric measure. These sociometric data do indeed support the hypothesis that statistically significant differences in mean scores of perceived masculine self-image and perceived peer adjustment would be observed between father-present and father-absent adolescent males. Both differences were statistically significant - peer relationships at p [less than] .01 and masculine self-concept at p [less than] .05. Also, most of the individual item means of the father-present group were higher than those of the father-absent group.

It must be strongly emphasized that these findings are subject to a variety of possible interpretations (i.e., there are certainly many alternative explanations for these observed differences). In a causal/comparative design such as this, it is impossible to know whether alternative independent variables other than paternal presence or absence account for the observed group differences. In particular, it is difficult to generalize the results of this study to other middle school students, since many of the environmental factors associated with a suburban school setting are not similar to those of urban or rural settings. Also, the maturational effects of normal developmental processes do indeed produce a multifactorial explanation of complex psychosocial constructs such as self-concept and peer relations. However, the fact that this study's findings do replicate those of previous studies adds considerable weight to the validity of the paternal absence interpretation.

Such results have implications, not only for additional research, but for counselors, teachers, and other professionals who are attempting to develop appropriate strategies to assist adolescents in identifying and rectifying deficits in peer relationships and self-concept. Deficits which can be linked to early father deprivation might be at least somewhat susceptible to subsequent interventions. The connection between these dysfunctions and problems such as poor academic performance/school attendance, alcohol and drug abuse, and a variety of socially maladaptive behaviors is rather easy to conceptualize. If only a fraction of those youth who experience these types of dysfunctional behaviors as a result of early paternal absence could be helped to improve their self-image and peer interactions, then the time and resources devoted to these interventions would be worthwhile. Simply knowing that this kind of alternative family structure may have a negative effect on a youngster's personal and interpersonal capabilities is in itself an important piece of information for those who are in a position to offer assistance.

REFERENCES

Adelson, J. (1980). Handbook of adolescent psychology. New York: Wiley.

Armsden, G.G. (1986). Attachment to parents and peers in late adolescence: Relationships to affective status, self-esteem and coping with loss, threat and challenge. Unpublished doctoral dissertation, University of Washington.

Biller, H.B., & Bahm, R.M. (1971). Father absence, perceived maternal behavior, and masculinity of self-concept among junior high school boys. Developmental Psychology, 4(2), 178-181.

Block, J.H. (1973). Conceptions of sex role: Some crosscultural and longitudinal perspectives. American Psychologist, 6, 512-528.

Hetherington, E.M. (1966). Effects of paternal absence on sex-typed behaviors in Negro and white preadolescent males. Journal of Personality & Social Psychology, 4(1), 87-91.

Hetherington, E.M. (1972). Effects of father absence on personality development in adolescent daughters. Developmental Psychology, 7, 313-326.

Hughes, F.P., & Noppe, L.D. (1991). Human development across the life span (2nd ed.). Columbus, OH: Merrill.

Johnson, L.A. (1979). Divorce, father absence, and father-child relationship as predictors of pre-adolescent children's peer relationships and perspective-taking performance. Unpublished doctoral dissertation, Stanford University.

Kerr, M.M., Nelson, C.M., & Lambert, D.L. (1987). Helping adolescents with learning and behavior problems. Columbus, OH: Merrill.

Lamb, M. (1981). The role of the father in child development. (2nd. ed.). New York: Wiley.

Lynn, D.D., & Sawrey, W.L. (1959). The effects of father absence on Norwegian boys and girls. Journal of Abnormal & Social Psychology, 59, 258-262.

McCord, J. McCord, W., & Thurber, E. (1962). Some effects of paternal absence on male children. Journal of Abnormal & Social Psychology, 64, 361-369.

Stevenson, M.R., & Black, C.N. (1988). Paternal absence and sex-role development: A meta-analysis. Child Development, 59, 793-814.

Steinberg, L. (1989). Adolescence (2nd ed.). New York: Knopf.

COPYRIGHT 1995 Libra Publishers, Inc.

For permission to reuse this article, contact Copyright Clearance Center.

HighBeam™ Research, Inc. © Copyright 2008. All rights reserved.

# EXHIBIT B



# CRB



**CALIFORNIA**
**STATE LIBRARY**
FOUNDED 1850

California Research Bureau
900 N Street, Suite 300
PO Box 942837
Sacramento, CA 94237-0001
(916) 653-7843 phone
(916) 654-5829 fax

## Children of
## Incarcerated Parents

*By Charlene Wear Simmons, Ph.D.*

*Prepared at the Request of
Assemblymember Kerry Mazzoni*

MARCH 2000

# Children of Incarcerated Parents

*By Charlene Wear Simmons, Ph.D.*

*Prepared at the Request of*
*Assemblymember Kerry Mazzoni*

**MARCH 2000**

CRB Note Vol. 7, No. 2

# INTRODUCTION

Children whose parents have been arrested and incarcerated face unique difficulties. Many have experienced the trauma of sudden separation from their sole caregiver, and most are vulnerable to feelings of fear, anxiety, anger, sadness, depression and guilt. They may be moved from caretaker to caretaker. The behavioral consequences can be severe, absent positive intervention—emotional withdrawal, failure in school, delinquency and risk of intergenerational incarceration.[1]  Yet these children seem to fall through the cracks. Police do not routinely ask at the time of arrest whether their prisoners have children, nor do sentencing judges or correctional agencies regularly raise this question. Since no agency collects data about these children, "…it is unclear how many are affected, who they are, or where they live."[2]

Assemblymember Kerry Mazzoni requested that the California Research Bureau (CRB) conduct a broad research review to summarize what is known about the children of incarcerated parents. This CRB note estimates the number of children in California who have parents in the state's criminal justice system (jail, prison, parole and probation) and summarizes key findings from the research literature. Although considerable information has been generated in a number of small-scale studies, the Child Welfare League of America concludes "…the true scope of the problem is uncertain because few reliable statistics exist."[3]

## HOW MANY CHILDREN?

*An estimated 856,000 children in California have a parent currently involved in California's adult criminal justice system, nearly nine percent of the state's children.*[4] This is an estimate because California does not request or keep family information about arrested or convicted persons. We estimate that approximately 195,000 children currently have parents in state prison, 97,000 have parents in jail, and 564,000 children have parents on parole or probation (Chart 1). The assumptions on which these estimates are based are explained below.

Over time many more children are affected, as some parents leave the system while new ones are arrested. Thus the total impact of the criminal justice system on the state's children, families and communities is much larger over time. By way of comparison, while an estimated 1.5 million children nationwide have incarcerated parents, around 10 million more have parents who were imprisoned at some point in their children's lives.[5]



**Chart 1**

**Children with Parents in California's Adult Criminal Justice System**

State Prison
195,000

Parole & Probation
564,000

County Jail
97,000

## State Prisons

There are approximately 195,000 children in California who currently have a parent in state prison, an estimate derived from the following statistics. Around 165,000 adults are incarcerated in California prisons, of which 93 percent are men and seven percent are women.[6] About 80 percent of the women prisoners are parents with an average of two children each—nearly 20,000 children.[7] Around seven percent of incarcerated women give birth while in California prisons.[8] An estimated 56 percent of the male prisoners nationally are parents, with an average of two children each.

## County Jails

An estimated 79,000 adults (average daily census) are incarcerated in California jails, 12 percent of whom are women.[9] Assuming that the percentages of jailed prisoners with children, and the average number of children, are roughly equivalent to those of the prison population (the literature on jailed parents is remarkably thin), there are approximately 97,000 children in California with parents in jail.

## Parole and Probation

There are nearly 115,000 adults who were formerly in prison currently being supervised on parole,[10] and 350,000 adults who were formerly in jail currently being supervised on probation.[11] Slightly more than 10 percent are females (10.6 percent). Assuming that the ratios of parents and numbers of children are approximately the same as with the adult prison population, another 564,000 children currently have parents under supervision by California's adult criminal justice system.

## Demographic Data

A 1992 Assembly Office of Research report, *Children of Incarcerated Parents*, found "very little accurate information regarding these children."[12] The report noted that, "These children are not recognized as a group by any state agency or department in California."[13] This is still the case. The police and courts do not regularly inquire at the time of arrest or sentencing whether a prisoner has children. One prominent researcher contends that "...these children have tended to be ignored by the criminal justice and social services systems..." and she decries the "...glaring shortage of current information regarding these children."[14] It is not possible to accurately specify numbers, ages, gender, or location.

## IMPACT OF PARENTAL ARREST AND INCARCERATION

*The children were found to have experienced emotional problems, nightmares, fighting in school and a decline in academic performance as a result of being separated due to their mother's incarceration.*[15]

The impact of a mother's arrest and incarceration on a family is often more disruptive than that of a father's arrest and incarceration.[16] That is because approximately two-thirds of incarcerated mothers were the primary caregivers for at least one child before they were arrested.[17] About 60 percent of children live with grandparents (usually maternal) after their mother's incarceration, 17 percent live with other relatives and a quarter live with non-relatives (often in foster care).[18] In contrast, only half of incarcerated fathers were living with their youngest child prior to incarceration, and most of their children (nearly 90 percent) continued to live with their mothers after the incarceration.

A significant number of children are present at the time of their parents' arrest. For example, a survey of jailed mothers in Riverside, California, found that one in five of their children were present at the time of their arrest, and over half of the children were between three and six years old.[19]

A number of small-scale studies[20] suggest that the effects of parental arrest and incarceration on a child's development are profound. The children may suffer from multiple psychological problems including trauma, anxiety, guilt, shame, and fear.[21] Negative behavioral manifestations can include sadness, withdrawal, low self-esteem, decline in school performance, truancy, and use of drugs or alcohol and aggression.[22] A study of 36 children from five to 16 years old who were participating in a visitation program at a women's prison, found that three quarters of the children reported "...symptoms including depression, difficulty in sleeping, concentration problems, and flashbacks about their mother's crimes or arrests...[and] poor school performance."[23]

| Table 1 Children's Problems as Identified by Their Caregivers | |
|---|---|
| | Percent |
| Learning/school | 28.8 |
| Health/mental health | 3.0 |
| Behavioral | 27.3 |
| Teen pregnancy | 1.5 |
| Alcohol or drug | 3.0 |
| Other | 10.6 |
| Source: National Council on Crime and Delinquency, 1993 | |

Dr. Denise Johnston, Director of the Center for Children of Incarcerated Parents at
Pacific Oaks College in Pasadena, California, has studied the impact of parental crime,
arrest and incarceration on children's development. Her work is summarized in Table 2.

| Table 2 Possible Developmental Effects on Children of Parental Crime, Arrest, and Incarceration | | | | |
|---|---|---|---|---|
| Developmental Stage | Developmental Characteristics | Developmental Tasks | Influencing Factors | Effects |
| Infancy (0-2 years) | Total dependency | Attachment and trust | Parent-child separation | Impaired parent-child bonding |
| Early childhood (2-6 years) | Increased perception and mobility; incomplete individuation from parent | Sense of autonomy, independence and initiative | Parent-child separation; Trauma | Anxiety, developmental regression, acute traumatic stress, survivor guilt |
| Middle childhood (7-10 years) | Increased independence, ability to reason, importance of peers | Sense of industry, ability to work productively | Parent-child separation, enduring trauma | Acute traumatic stress and reactive behaviors |
| Early adolescence (11-14 years) | Increasing abstract thinking, future-oriented behavior, aggression, puberty | Ability to work productively with others, control of emotions | Parent-child separation, enduring trauma | Rejection of limits on behavior, trauma-reactive behaviors |
| Late adolescence (15-18 years) | Emotional crisis and confusion, adult sexual development, abstract thinking, independence | Achieves identity, engages in adult work and relationships, resolves conflicts with family and society | Parent-child separation, enduring trauma | Premature termination of parent-child relationship; intergenerational crime and incarceration |
| Source: Dr. Denise Johnston, "Effects of Parental Incarceration," in Gabel and Johnston, p. 68. | | | | |

It is difficult for parents to maintain contact with their children while they are
incarcerated. More than half of incarcerated mothers do not receive any visits from their
children while they are in prison. The single most significant reason for lack of contact is
the children's distance from their mothers' prisons, many of which are located far from
major population centers. In California, 60 percent of women prison inmates are from
Southern California but the two largest women's prisons, Central California Women's
Facility and the Valley State Prison for Women, are located near Chowchilla, about 260
miles north of Los Angeles.

Multiple parental arrests and the resulting pattern of repeated parent-child separation can
be devastating for children and have severe social consequences, such as delinquency and
intergenerational incarceration. Dr. Johnston examined a group of older children of
offenders, the majority of whom were gang-involved or delinquent, and found that
"…only one in 11 children studied had lived continuously with one primary caregiver
since birth."[24]

According to the Women's Prison & Home Association, Inc., "Children of offenders are five times more likely than their peers to end up in prison themselves. One in 10 will have been incarcerated before reaching adulthood."[25]  Table 3 charts the interconnecting pattern of childhood trauma, emotional response, reactive behavior and potential criminal activity that can lead to intergenerational incarceration absent positive intervention.

| Table 3 Intergenerational Behaviors, Crime and Incarceration | | | | |
|---|---|---|---|---|
| **Childhood Trauma** | **Emotional Response** | **Reactive Behavior** | **Coping Pattern** | **Criminal Activity** |
| Physical abuse | Anger | Physical aggression | Fighting with peers | Assault |
| Parent-child separation | Sadness, grief | Withdrawal | Substance abuse | Drug possession |
| Witness to violence | Anxiety | Hypervigilence | Gang activity | Accessory to homicide |
| Parental substance abuse | Anger | Verbal aggression | Asocial behavior (lying, stealing) | Fraud |
| Sexual molestation | Fear, anxiety | Sexualized behavior | Promiscuity | Prostitution |
| Source: Dr. Denise Johnston, "Effects of Parental Incarceration," in Gabel and Johnston, p. 81. | | | | |

Although the children of incarcerated parents are at high risk for negative personal and social behaviors, their lack of visibility in the criminal justice and child welfare systems can inhibit positive intervention and may led to neglect.  Most jurisdictions do not request or collect family information from prisoners.  Very few require law enforcement officers to inquire at the time of arrest whether a prisoner has children.[26]  The courts do not routinely inquire whether a prisoner has children at the time of sentencing, missing another opportunity to identify the children and intervene if needed.

An American Bar Association (ABA) study found that "While law enforcement policies and procedures specifically addressing children of arrestees may not currently exist in most agencies, the issue of accountability–and subsequently legal liability–is nevertheless present."[27]  The courts have found that officers have a duty to reasonably ensure the safety of children left unattended following a caretaker's arrest [*White v. Rochford*, 592 F2d 381 (7th Cir. 1979)].  The ABA study found that law enforcement officers make a variety of placement decisions in the field, calling in child protective services (CPS), taking the child to the police station, or informally placing the child with the parent's neighbors, relatives or friends.  Anecdotal information suggests that the children of incarcerated parents sometimes end up in court when they are ready to enter school and need vaccinations, having been informally left with friends or relatives who lack legal authority for their medical care.[28]

## A PROFILE OF INCARCERATED MOTHERS

According to a 1987 national study by the American Correctional Association, the average adult female offender is a minority between the ages of 25 and 29 who before arrest was a single parent living with one to three children. She comes from a single parent or broken home. Half of her other family members are incarcerated, including 54 percent of her brothers and sisters. She is a high school drop out, unemployed, likely to have been the victim of sexual abuse, started using alcohol or drugs between the ages of 13 and 14, and has "…committed crimes for the following primary reasons: to pay for drugs, relieve economic pressures, or poor judgement."[29] More recent studies confirm this general description.[30]

| Table 4 History of Physical or Sexual Abuse and Substance Abuse of Incarcerated Mothers (1991) | |
| --- | --- |
| | Percent* |
| Physical Abuse at some time | 52.8 |
| Sexual Abuse at some time | 41.7 |
| Regular use of alcohol or drugs | 64.5 |

*Percentages represent those with affirmative response for each type of abuse.
Source: National Council on Crime and Delinquency, 1993.

California has the largest female prison population in the United States.[31] The number of adult women incarcerated in California prisons increased nearly nine times between 1980 and 1998, from 1,316 to 11,694. In 1998, 43 percent of California's women felons were incarcerated for drug crimes,[i] 30 percent for property crimes[ii] and 24 percent for crimes against other people.[iii] The number imprisoned for drug crimes more than tripled between 1983 and 1998, while the number of imprisoned for violent crimes declined (see Chart 2.). National research finds an even larger proportional increase in women's imprisonment due to drug crimes: "The number of women incarcerated in state prisons for a drug offense rose by 888% from 1986 to 1996."[32]

---

[i] Possession, possession for sale, manufacturing and sales.
[ii] Burglary, theft, forgery/fraud.
[iii] Homicide, robbery, assault and battery, sex offenses, kidnapping.



Chart 2
**California Incarcerated Females by Offense**

A 1995 study of California's female prisoners found that their "...involvement in criminal behavior is tied directly to drug use and a lack of viable economic skills."[33]  The U.S. Department of Justice found that nationwide, while violent crimes decreased, the increase in "...sentenced drug offenders accounted for 55% of the increase in the female prison population between 1986 and 1991."[34]  Drug abuse can lead to repeated incarceration.  A 1991 study of state female prisoners by the U.S. Department of Justice, Bureau of Justice Statistics, found that 29 percent had no prior sentence, 22 percent had one prior sentence, 15 percent had two priors, 20 percent had three to five priors, and 15 percent had six or more prior sentences.[35]

The pattern of crime for incarcerated women is quite different from that of incarcerated men in California.  Men are much more likely to be imprisoned for violent crimes (Chart 3).



Chart 3
**California Incarcerated Felons by Offense Category and Sex, 1998**

## KEY ISSUES RAISED IN THIS REVIEW

This CRB research note raises a number of issues that merit summarizing.

First, research findings about the children of incarcerated parents are primarily based on small-scale studies or on surveys of prisoners. A great deal is not known about the children or their caregivers.

Second, although law enforcement and the criminal justice system profoundly intervene in children's lives when their parents are arrested and incarcerated, there is no clear official policy about how officials should respond. Yet law enforcement officials may be liable. Some children appear to fall through the cracks and are left in legally ambiguous situations, such as with neighbors. In addition, the courts and the correctional system do not regularly request or collect information about prisoners' families. The informal legal status of some children's caregivers, and lack of court supervision, may lead to inappropriate placements.

Third, the children of incarcerated parents are at high risk for a number of negative behaviors that can lead in some instances, absent positive intervention, to school failure, delinquency and intergenerational incarceration. The personal and social costs are high.

Fourth, the lack of research and official information means that government programs do not target these children and their caregivers in order to design or provide needed services. The public monetary costs of current services, and the costs of not providing useful interventions, cannot be accurately calculated.

Fifth, there may be a more pressing and poignant need to address this issue. Under the federal Adoption and Safe Families Act of 1997, parental rights can be terminated if a child has been in foster care 15 of the last 22 months. A recent Government Accounting Office (GAO) report finds that the maximum median sentence for female offenders in state and local prisons is 60 months.[36]

---

[1] Cynthia Seymour, "Children with Parents in Prison: Child Welfare Policy, Program, and Practice Issues," *Child Welfare, Special Issue, Children with Parents in Prison*, Child Welfare League of America, Vol. LXXVII, September/October 1996, p. 472.

[2] Op. cit., p. 470.

[3] Ibid.

[4] There are about 9.8 million children ages 0-18 in California, more than 29 percent of the state's population. U.S. Census Bureau, March 1999 Current Population Survey.

[5] The Women's Prison Association & Home, Inc., *Family to Family; Partnerships between Corrections and Child Welfare*, Part Two, A Project of the Annie E. Casey Foundation, p. 8.

[6] Legislative Analyst Office, "Department of Corrections," *LAO Analysis of the 1999-00 Budget*, Sacramento, January 2000, and California Department of Corrections, *California Prisoners and Parolees*, 1999, p. 46.

[7] Barbara Bloom, "Imprisoned Mothers," in *Children of Incarcerated Parents*, edited by Katherine Gabel and Denise Johnston, M.D.,Lexington Books, New York, 1995, p. 21. Some girls in the state's juvenile facilities are mothers; their children are not included in this estimate.

---

# EXHIBIT C

1/23/08

Dear Honorable Jed S. Rakoff,

                    My name is
Darrell Rice #60250-054, I'm being detained at
M.D.C. Brooklyn on count 2 of my indictment
and I pleaded guilty of part of my plea agreement.


                    Your Honor, this is a ruff part of
my life cause I've a family of my own (a son
and a daughter), I was supporting my family
working as a helper for a constrution company
for the last 2 years prior to my arrest. I
know what I did was illegal and I accept
full responsibility for my action. However, I'm
asking for leniency, I don't want my kids
to follow my foot step's. I want to guide my
kids the right way, a way my father didn't
guide me to. I know I'm going to do some
years and I respect the court decision on
how many years I got.

Regards,

Darrell Rice

60250-054